REDACTED

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | : Master File No. 12-md-02311 : Honorable Marianne O. Battani : |
| IN RE AUTOMOTIVE LAMPS | : CONSOLIDATED AMENDED CLASS : ACTION COMPLAINT : |
| THIS DOCUMENT RELATES TO: END-PAYOR ACTION | : Case No. 2:13-cv-01203-MOB-MKM : : JURY TRIAL DEMANDED : : [REDACTED] : : |

Plaintiffs Ifeoma Adams, Halley Ascher, Gregory Asken, Melissa Barron, Kimberly Bennett, David Bernstein, Ron Blau, Tenisha Burgos, Kent Busek, Jennifer Chase, Rita Cornish, Nathan Croom, Lori Curtis, Jessica Decastro, Alena Farrell, Jane Fitzgerald, Carroll Gibbs, Dori Gilels, Jason Grala, Ian Groves, Curtis Gunnerson, Paul Gustafson, Tom Halverson, Curtis Harr, Andrew Hedlund, Gary Arthur Herr, John Hollingsworth, Leonard Julian, Carol Ann Kashishian, Elizabeth Kaufman, Robert Klingler, Kelly Klosterman, James Marean, Michelle McGinn, Nilsa Mercado, Rebecca Lynn Morrow, Edward Muscara, Stacey Nickell, Sophie O'Keefe-Zelman, Roger Olson, Susan Olson, William Picotte, Whitney Porter, Cindy Prince, Janne Rice, Robert Rice, Jr., Frances Gammell-Roach, Darrel Senior, Meetesh Shah, Darcy Sherman, Erica Shoaf, Arthur Stukey, Kathleen Tawney, Jane Taylor, Keith Uehara, Michael Wick, Thomas Wilson, and Phillip Young ("Plaintiffs"), on behalf of themselves and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel,

1

**REDACTED**

bring this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, consumer protection, and unjust enrichment laws, and allege as follows:

## NATURE OF ACTION

1. This lawsuit is brought as a proposed class action against Defendants Koito Manufacturing Co., Ltd., North American Lighting, Inc. (together, "Koito Defendants" or "Koito"), Mitsuba Corporation, American Mitsuba Corporation (together, "Mitsuba Defendants" or "Mitsuba"), Stanley Electric Co., Ltd., Stanley Electric U.S. Co., Inc., and II Stanley Co., Inc. (collectively, "Stanley Defendants" or "Stanley") (all as defined below, and collectively "Defendants"), and unnamed co-conspirators, manufacturers and/or suppliers of Automotive Lamps (defined below) globally and in the United States, for engaging in a long-running conspiracy to unlawfully fix, artificially raise, maintain and/or stabilize prices, rig bids for, and allocate the market and customers in the United States for Automotive Lamps. According to the United States Department of Justice ("DOJ"), Defendants' conspiracy successfully targeted the long-struggling United States automotive industry, raising prices for car manufacturers and consumers alike.

2. "Automotive Lamps," as used herein, include headlamps and rear combination lamps installed by automobile original equipment manufacturers ("OEMs"). A headlamp is an Automotive Lamp installed in the front of an automobile, which consists of lights such as headlights, a clearance lamp and turn signals. A rear combination lamp is an Automotive Lamp installed in the rear of an automobile, which consists of lights such as a backup lamp, stop lamp, tail lights and turn signals.

2

**REDACTED**

3.      Plaintiffs seek to represent all persons and entities who, during the period from and including June 1997 through such time as the anticompetitive effects of the Defendants' conduct ceased (the "Class Period") purchased or leased a new vehicle in the United States for personal use and not for resale which included one or more Automotive Lamp(s) as a component part, which were manufactured or sold by the Defendants, any current or former subsidiary of the Defendants or any co-conspirator of the Defendants.

4.      Defendants manufacture, market, and/or sell Automotive Lamps throughout and into the United States. Defendants and other co-conspirators (as yet unknown) agreed, combined and conspired to fix, raise, maintain and/or stabilize prices, rig bids, and allocate the market and customers in the United States for Automotive Lamps.

5.      The U.S. Department of Justice's ("DOJ") Antitrust Division is currently conducting a broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry.  As part of its criminal investigation, the DOJ is seeking information about unlawful anticompetitive conduct in the market for a number of different but related automotive parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the automotive parts industry.  The automotive parts investigation is the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and its impact on American consumers and businesses.  The ongoing cartel investigation of price-fixing and bid-rigging in the automotive parts industry has yielded more than $2.5 billion in criminal fines.

6.      Defendant Koito Manufacturing Co., Ltd. agreed to plead guilty to a two-count criminal Information and to pay a $56.6 million fine for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to

**REDACTED**

rig bids for, and to fix, stabilize, and maintain the prices of, automobile lighting fixtures and automotive high-intensity discharge ("HID") lamp ballasts sold to automobile manufacturers in the United States and elsewhere from at least as early as June 1997 until about July 2011 and from at least as early as July 1998 until at least February 2010, respectively. The combination and conspiracy engaged in by Defendant Koito Manufacturing Co., Ltd. and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

7.     Defendant Mitsuba Corporation agreed to plead guilty and to pay a criminal fine of $135 million for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive parts sold to automobile manufacturers, including Honda Motor Company, Ltd., Fuji Heavy Industries Ltd., Nissan Motor Company, Ltd., Toyota Motor Corporation, Chrysler Group LLC, and certain of their subsidiaries, affiliates and suppliers in the United States and elsewhere, from at least as early as January 2000 through at least February 2010. "Automotive parts," for purposes of the plea agreement, included windshield wiper systems and components thereof, windshield washer systems and components thereof, starter motors, power window motors, fan motors, radiator fans, door mirrors, lamps, power seat motors, sunroof, door and tailgate motors, electric power steering motors, electronic throttle motors, horns, automotive electric relays and switches, automotive electric actuators, AC generators, and fuel pumps. The combination and conspiracy engaged in by Defendant Mitsuba Corporation and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

4

**REDACTED**

8.     In addition to the fact that Defendant Mitsuba Corporation pleaded guilty and agreed on its own behalf and on behalf of its subsidiaries to cooperating in the government's investigation, several of its high-ranking executives have pleaded guilty to, or been indicted for, criminal price-fixing in the automotive parts industry.

9.     On December 1, 2014, the DOJ announced that a former executive of Defendant Mitsuba, Kazumi Umahashi, agreed to serve thirteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count Information charging him with conspiring to fix the prices of certain automotive parts installed in cars sold in the United States and elsewhere. According to the Information, Kazumi Umahashi participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, windshield wiper systems and starter motors sold to Honda Motor Company Ltd. and certain of its subsidiaries, affiliates, suppliers, and others in the United States and elsewhere.

10.     On February 5, 2015, the DOJ announced that a federal grand jury returned a two-count Indictment against two former executives of Defendant Mitsuba Corporation, Hiroyuki Komiya and Hirofumi Nakayama, for (1) conspiring to fix the prices of various automotive parts, including windshield wiper systems and components, sold to Honda Motor Company Ltd., Nissan Motor Co. Ltd., Toyota Motor Corp., Chrysler Group, LLC, Fuji Heavy Industries Ltd., and certain of their subsidiaries in the United States and elsewhere; and (2) for knowingly and corruptly persuading, and attempting to persuade, employees of Mitsuba to destroy documents and delete electronic data that may contain evidence of antitrust crimes in the United States and elsewhere.

REDACTED

11.     According to the plea agreements of Defendant Mitsuba and its former executives, conspiratorial meetings and discussions took place in the United States and elsewhere, and the automotive parts that were the subject of the conspiracy were sold to Honda Motor Company Ltd., Nissan Motor Co. Ltd., Toyota Motor Corp., Chrysler Group, LLC, Fuji Heavy Industries Ltd., and certain of their subsidiaries, affiliates, and suppliers located in the U.S. and elsewhere by Defendant Mitsuba and its U.S. subsidiaries located in the Eastern District of Michigan and elsewhere.

12.     Defendant Stanley Electric Co., Ltd. agreed to plead guilty to a one-count criminal Information and to pay a $1.44 million fine for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, automotive HID lamp ballasts sold to automobile manufacturers in the United States and elsewhere from as early as July 1998 until at least February 2010.  The combination and conspiracy engaged in by Defendant Stanley Electric Co., Ltd. and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

13.     Competition authorities in Japan and possibly elsewhere have also been investigating a conspiracy in the market for Automotive Lamps since at least March 2012. The Japanese Fair Trade Commission ("JFTC") raided the offices of Defendants.  On March 21, 2013, the JFTC announced that it had levied fines totaling $49.1 million, including a $36 million fine against Defendant Koito Manufacturing Co., Ltd. for violating antitrust laws by forming a cartel to fix prices for Automotive Lamps. On March 21, 2013, the JFTC also announced the imposition of cease-and-desist orders against Defendant Koito Manufacturing Co., Ltd., requiring it to (i) immediately pass resolutions that they would terminate any illegal

**REDACTED**

conduct in the Automotive Lamps industry, (ii) contact any automobile maker who may have purchased its Automotive Lamps through collusive bidding processes, (iii) refrain from engaging in such illegal conduct in the future, and (iv) implement employee antitrust compliance programs. According to the JFTC, fellow conspirator Stanley Electric Co., Ltd. also violated antitrust laws, but did not receive a cease-and-desist order.

14.    The Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of, Automotive Lamps sold to vehicle manufacturers and others in the United States.  The combination and conspiracy engaged in by the Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and state antitrust, unfair competition, consumer protection and unjust enrichment laws.

15.    As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Classes paid artificially inflated prices for Automotive Lamps during the Class Period and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

16.    Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection, and unjust enrichment laws, and seek to obtain restitution, recover damages and secure other relief against the Defendants for violations

**REDACTED**

of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

17.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337. This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from the Defendants.

18.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

19.     This Court has *in personam* jurisdiction over each of the Defendants because each, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Automotive Lamps throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United

**REDACTED**

States, including in this District. The Defendants also conduct business throughout the United States, including in this jurisdiction, and have purposefully availed themselves of the laws of the United States.

20.     The Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

21.     The activities of the Defendants and their co-conspirators directly targeted the United States automobile market and were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. The Defendants' products are sold in the flow of interstate commerce.

22.     Automotive Lamps manufactured abroad by the Defendants and sold for use in vehicles in the United States are goods brought into the United States for sale, and therefore constitute import commerce. To the extent any Automotive Lamps are purchased in the United States, and such Automotive Lamps do not constitute import commerce, the Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to in the United States.

23.     By reason of the unlawful activities hereinafter alleged, the Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  The Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for Automotive Lamps, which

**REDACTED**

conspiracy unreasonably restrained trade and adversely affected the market for Automotive Lamps.

24.     The Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased or leased a new vehicle in the United States not for resale which included one or more Automotive Lamps.

## PARTIES

### Plaintiffs

25.     Plaintiff Ifeoma Adams is a California resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

26.     Plaintiff Halley Ascher is a Washington D.C. resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

27.     Plaintiff Gregory Asken is Nevada resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

28.     Plaintiff Melissa Barron is a California resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

29.     Plaintiff Kimberly Bennett is an Arkansas resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

30.     Plaintiff David Bernstein is a Minnesota resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

31.     Plaintiff Ron Blau is a Massachusetts resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

32.     Plaintiff Tenisha Burgos is a New York resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

**REDACTED**

33.     Plaintiff Kent Busek is a North Dakota resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

34.     Plaintiff Jennifer Chase is an Iowa resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

35.     Plaintiff Rita Cornish is a Utah resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

36.     Plaintiff Nathan Croom is a Nebraska resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

37.     Plaintiff Lori Curtis is a Missouri resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

38.     Plaintiff Jessica DeCastro is a Missouri resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

39.     Plaintiff Alena Farrell is a Vermont resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

40.     Plaintiff Jane Fitzgerald is a Vermont resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

41.     Plaintiff Carroll Gibbs is a Washington D.C. resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

42.     Plaintiff Dori Gilels is a Montana resident who purchased at least one Automotive Lamp indirectly from one or more Defendants

43.     Plaintiff Jason Grala is a New York resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

11

**REDACTED**

44.     Plaintiff Ian Groves is a New Mexico resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

45.     Plaintiff Curtis Gunnerson is a Minnesota resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

46.     Plaintiff Paul Gustafson is an Oregon resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

47.     Plaintiff Tom Halverson is an Arizona resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

48.     Plaintiff Curtis Harr is a Fargo, North Dakota resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

49.     Plaintiff Andrew Hedlund is a South Carolina resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

50.     Plaintiff Gary Arthur Herr is a Florida resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

51.     Plaintiff John Hollingsworth is a California resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

52.     Plaintiff Leonard Julian is a Nevada resident who purchased at least one Automotive Lamp indirectly from one or more Defendants

53.     Plaintiff Carol Ann Kashishian is a Wisconsin who purchased at least one Automotive Lamp indirectly from one or more Defendants.

54.     Plaintiff Elizabeth Kaufman is a Florida resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

**REDACTED**

55.     Plaintiff Robert Klinger is a Missouri resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

56.     Plaintiff Kelly Klosterman is a North Dakota resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

57.     Plaintiff James Marean is a Maine resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

58.     Plaintiff Michelle McGinn is a Nevada resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

59.     Plaintiff Nilsa Mercado is a Michigan resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

60.     Plaintiff Rebecca Lynn Morrow is an Arizona resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

61.     Plaintiff Edward Muscara is a New Hampshire resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

62.     Plaintiff Stacey Nickell is a West Virginia resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

63.     Plaintiff Sophie O'Keefe-Zelman is an Arizona resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

64.     Plaintiff Roger Olson is a Michigan resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

65.     Plaintiff Susan Olson is a Michigan resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

**REDACTED**

66.     Plaintiff William Picotte is a former South Dakota resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

67.     Plaintiff Whitney Porter is a Washington D.C. resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

68.     Plaintiff Cindy Prince is an Oregon resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

69.     Plaintiff Janne Rice is a West Virginia resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

70.     Plaintiff Robert Rice, Jr. is a West Virginia resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

71.     Plaintiff Frances Gammell-Roach is a Rhode Island resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

72.     Plaintiff Darrel Senior is a Kansas resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

73.     Plaintiff Meetesh Shah is a California resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

74.     Plaintiff Darcy Sherman is a Minnesota resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

75.     Plaintiff Erica Shoaf is an Arizona resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

76.     Plaintiff Arthur Stukey is a Vermont resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

**REDACTED**

77.     Plaintiff Kathleen Tawney is a North Carolina resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

78.     Plaintiff Jane Taylor is a Hawaii resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

79.     Plaintiff Keith Uehara is a Hawaii resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

80.     Plaintiff Michael Wick is a New Mexico resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

81.     Plaintiff Thomas Wilson is a Mississippi resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

82.     Plaintiff Phillip Young is a Tennessee resident who purchased at least one Automotive Lamp indirectly from one or more Defendants.

**Defendants**

83.     When Plaintiffs refer to a corporate family or companies by a single name in the Complaint, they are alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family. The individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of their respective corporate families. As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

**Koito Defendants**

REDACTED

84.     Defendant Koito Manufacturing Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Koito – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Lamps that were sold and purchased throughout the United States, including in this District, during the Class Period. Koito is the number one supplier of Automotive Lamps in the world and holds a 26 percent share of the global market for such products. Koito is the parent corporation of North American Lighting, Inc., the leading manufacturer of automotive lighting products in the United States. In the United States, Koito supplies automotive lighting products to Toyota, Honda, Ford, BMW, Subaru, Mitsubishi, Nissan, Lexus, GM and Chrysler. In 2011, Koito had net sales of $5.16 billion, including net sales in North America of $550 million.

85.     Defendant North American Lighting, Inc. is a Michigan corporation with its principal place of business in Illinois.  It is a subsidiary of and wholly-owned and/or controlled by its parent, Koito Manufacturing Co., Ltd.  North American Lighting, Inc. manufactured, marketed, and/or sold Automotive Lamps that were sold and purchased throughout the United States, including in this District, during the Class Period.

**Mitsuba Defendants**

86.     Defendant Mitsuba Corporation is a Japanese corporation with its principal place of business in Gunma, Japan. Mitsuba – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Lamps that were sold and purchased throughout the United States, including in this District, during the Class Period. In 2011, Mitsuba had net sales of $2.52 billion, including net sales of $542 million in the United States, Mexico, and Brazil.

REDACTED

87.     Defendant American Mitsuba Corporation is an Illinois corporation with its principal place of business in Novi, Michigan.  It is a subsidiary of and wholly-owned and/or controlled  by its parent, Mitsuba Corporation.  American Mitsuba Corporation manufactured, marketed, and/or sold Automotive Lamps that were sold and purchased throughout the United States, including in this District, during the Class Period.

**Stanley Defendants**

88.     Defendant Stanley Electric Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Stanley – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Lamps that were sold and purchased throughout the United States, including in this District, during the Class Period. Stanley's major customers include Honda and Toyota. In 2011, Stanley had net sales of $2.98 billion, including net sales in North America of $396.4 million.

89.     Defendant Stanley Electric U.S. Co., Inc. is an Ohio corporation with its principal place of business in Ohio.  It is a subsidiary of and wholly-owned and/or controlled by its parent, Stanley Electric Co., Ltd.  Stanley Electric U.S. Co., Inc. manufactured, marketed, and/or sold  Automotive Lamps that were sold and purchased throughout the United States, including in this District, during the Class Period.

90.     Defendant II Stanley Co., Inc. is a Michigan corporation with its principal place of business in Michigan.  It is a subsidiary of and wholly-owned and/or controlled by its parent, Stanley Electric Co., Ltd.  II Stanley Co., Inc. manufactured, marketed, and/or sold Automotive Lamps  that were sold and purchased throughout the United States, including in this District, during the Class Period.

REDACTED

## AGENTS AND CO-CONSPIRATORS

91.     Each Defendant acted as the principal of or agent for the other Defendant with respect to the acts, violations, and common course of conduct alleged herein.

92.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

93.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

### A.     The Automotive Lamps Industry

94.     Automotive Lamps, as used herein, consist of headlamps and rear combination lamps. Headlamps on vehicles are primarily responsible for illuminating the road ahead during periods of low visibility, without blinding oncoming traffic. In addition, headlamps make a vehicle easily visible. Rear combination lamps functionally integrate communication signals from rear lights to inform drivers behind the vehicle of the presence of the car; stop lamps indicate that the brake is activated, turn signal lamps give a flashing warning light on the side of the vehicle toward the direction in which the car will be going, and backup lamps assure the

**REDACTED**

safety of the rear side of the car and indicate that the vehicle is moving backwards. *See* Figures 1, 2, 3 and 4.

Figure 1 (Headlamp)



Figure 2 (Rear Combination Lamp)



Figure 3 (Headlamps)

**REDACTED**



**REDACTED**

Figure 4 (Rear Combination Lamps)



95.     Automotive Lamps are installed by OEMs in new cars as part of the automotive manufacturing process.

96.     For new cars, the OEMs—mostly large automotive manufacturers such as Nissan, Toyota, Fuji Heavy Industries (Subaru), Mitsubishi and Mazda—purchase Automotive Lamps directly from Defendants. Automotive Lamps may also be purchased by component manufacturers who then supply such systems to OEMs. These component manufacturers are also called "Tier 1 Manufacturers" in the industry. Tier 1 Manufacturers supply Automotive Lamps directly to an OEM.

97.     When purchasing Automotive Lamps, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers. Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for four to six years. Typically, the bidding process begins approximately three years prior to the start of production of a new model. Japanese OEMs procure parts for U.S.-manufactured vehicles both in Japan and in the United States. *See* Figure 5 below, taken from the JFTC website.

**REDACTED**



2 Overview of the bidding processes for headlamps and rear combination lamps ordered by automobile companies

Figure 5

98.     Defendants and their co-conspirators supplied Automotive Lamps to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Automotive Lamps (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in

22

**REDACTED**

Japan for installation in vehicles manufactured in Japan for export to and sale in the United States.

99.     Plaintiffs and members of the proposed Classes purchased Automotive Lamps indirectly from one or more of the Defendants. By way of example, an owner of a vehicle may indirectly purchase an Automotive Lamp from Defendants as part of purchasing or leasing a new vehicle.

100.     In 2014, the U.S. market for automotive lighting is estimated to be $19.97 billion by *Transparency Market Research*. More than 90 percent of automotive lighting is related to exterior lighting and the headlamp market alone accounts for more than 70 percent of total automotive lighting.

101.     According to *Allied Market Research*, the automotive lighting market is anticipated to grow at a compound annual growth rate of 6.7 percent from 2014 to 2020. The global market value for automotive lighting is projected to reach USD 33.7 billion by 2020, though this includes interior and side lighting in addition to front and rear lighting.

      **B.     The Structure and Characteristics of the Automotive Lamps Market Render the Conspiracy More Plausible**

102.     The structure and other characteristics of the Automotive Lamps market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market. Specifically, the Automotive Lamps market: (1) has high barriers to entry; (2) has inelasticity of demand; and (3) is rife with opportunities to conspire.

      **1.     The Automotive Lamps Market Has High Barriers to Entry**

103.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-

**REDACTED**

competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

104.    There are substantial barriers that preclude, reduce, or make more difficult entry into the Automotive Lamps market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, and long-standing customer relationships.

105.    Each of the Defendants also owns at least one patent for Automotive Lamps. These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

106.    In addition, OEMs cannot change Automotive Lamp suppliers randomly after a supplier is initially selected because the OEMs design the features of their vehicles so that the Automotive Lamps it purchases for a vehicle are then integrated with the electronics, mechanics, thermal distribution and other features of the particular vehicle model. Thus, the design must be synergized by the Automotive Lamps manufacturers and OEMs. It would be difficult for a new market entrant to do so.

### 2.    There is Inelasticity of Demand for Automotive Lamps

107.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

108.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining

24

REDACTED

sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

109.    Demand for Automotive Lamps is highly inelastic because there are no close substitutes for these products. In addition, customers must purchase Automotive Lamps as an essential part of a vehicle, even if the prices are kept at a supra-competitive level.

### 3.    Defendants had Ample Opportunities to Conspire

110.    Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy. Members of the Automotive Lamps industry regularly hold symposiums to communicate the most recent technologies in the industry. As one industry publication explained, "life in the world's automotive lighting industry is rather like life in a small town: almost everyone knows what almost everyone else is doing, most of the time."

### C.    Government Investigations

111.    A globally coordinated antitrust investigation is taking place in the United States, Europe, Canada and Japan, aimed at suppliers of automotive parts in general, and Automotive Lamps in particular.  A JFTC official told a leading legal publication that the international automotive parts investigation would continue to widen because the automotive industry as a whole comprises many sub-industries.  He characterized the investigation being conducted by the international antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

112.    The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the European Commission ("EC").  The EC and the FBI have executed surprise raids at the European and U.S. offices of several auto parts manufacturers as

REDACTED

part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts.

113.    On February 8, 2010, the EC executed surprise raids at the European offices of certain automotive parts makers.  The DOJ has confirmed that its automotive parts investigation is the largest criminal investigation that the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the illegal conduct.  The DOJ has levied more than $2.5 billion in criminal fines against various automotive parts manufacturers.

114.    In February 2010, Japan's Fair Trade Commission raided the Tokyo offices of several automotive parts manufacturers as part of an expansive investigation into collusion in the automotive parts industry dating back to at least 2000.

115. On March 13, 2012, Defendants announced that the JFTC had raided their headquarters and some branch offices on suspicion of antitrust violations. At the time, a person familiar with the investigation stated that the authorities suspected the suppliers had, for over a decade, been fixing the prices of Automotive Lamps ahead of bidding on the RFQs issued by OEMs. The *Nikkei* reported that the JFTC carried out raids at 20 locations, including the headquarters of Koito and Stanley Electric in Tokyo and Mitsuba in Kiryu City, Gumma Prefecture.

116.    The JFTC raided offices of Defendants as part of the spreading investigation into suspected price fixing on automotive parts.  According to its 2012 Annual Report, Koito underwent an on-site inspection by the JFTC on suspicion of violating the Act on Prohibition of Private Monopolization and Maintenance of Fair Trade concerning transactions for automotive lighting equipment.

**REDACTED**

117.    On March 21, 2013, the JFTC handed down fines totaling $49.1 million, including a $36 million fine against Koito for violating antitrust laws by forming a cartel to fix prices for Automotive Lamps. On March 21, 2013 the JFTC also announced cease-and-desist orders against the violating companies, requiring them to (i) immediately pass resolutions that they would terminate any illegal conduct in the Automotive Lamps industry, (ii) contact any automobile maker who may have purchased their Automotive Lamps through collusive bidding processes,(iii) refrain from engaging in such illegal conduct in the future, and (iii) implement employee antitrust compliance programs. According to the JFTC, fellow conspirator Stanley also violated antitrust laws, but did not receive a cease-and-desist order.

118.    The Defendants rigged the bidding process for supply contracts with automobile makers of Automotive Lamps by pre-ordaining the winners and losers. The JFTC explained that these companies "substantially restrained competition in the fields of headlamps and rear combination lamps ordered by each automobile company, by designating successful bidders and managing to have the designated successful bidders win the bids, respectively."

119.    To illustrate the anticompetitive conduct engaged in by Defendants, Koito, Ichikoh and Stanley, the JFTC created a diagram, which is shown below:

REDACTED



120.    The JFTC also published a chart, replicated in relevant part below, illustrating when the Defendants conspired to rig-bids for RFQs issued by various automobile manufacturers.

Figure 7

| Automobile Companies | Starting Date of the Violation (at least as early as) | Defendant Violators |
|---|---|---|
| Nissan Motor Co., Ltd. & Nissan Shatai Co., Ltd. ("Nissan") | February 2003 | Koito, Ichikoh, Stanley |
| Toyota Motor Corp. ("Toyota") | February 2007 | Koito, Ichikoh, Stanley |
| Fuji Heavy Industries Ltd. ("Fuji") | July 2002 | Koito, Ichikoh, Stanley |
| Mitsubishi Motor Corp. | June 2004 | Koito, Stanley |

**REDACTED**

| | | |
|---|---|---|
| ("Mitsubishi") | | |
| Mazda Motor Corp. ("Mazda") | June 2004 | Koito, Stanley |

121.   Additionally, the JFTC published a second chart, replicated in relevant part below, stating the numbers of Automotive Lamps sold by Defendant Koito and Ichikoh to various automobile manufacturers at anticompetitive, artificially inflated prices.

Figure 8

| | Number of Automotive Lamps Ordered by Nissan | Number of Automotive Lamps Ordered by Toyota | Number of Automotive Lamps Ordered by Fuji | Number of Automotive Lamps Ordered by Mitsubishi | Number of Automotive Lamps Ordered by Mazda | Total |
|---|---|---|---|---|---|---|
| Koito | 1,380,010,000 | 271,330,000 | 806,960,000 | 222,700,000 | 747,590,000 | 3,428,590,000 |
| Ichikoh | 1,064,440,000 | 46,400,000 | 139,260,000 | (no violation) | (no violation) | 1,250,100,000 |
| Total Amt of Surcharge | 2,444,450,000 | 317,730,000 | 946,220,000 | 222,700,000 | 747,590,000 | 4,678,690,000 |

122.   The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe. "The antitrust division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers," Justice Department Spokeswoman Gina Talamona said.

123.   Indeed, on February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation. The FBI executed warrants and searched the offices of these companies. Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

REDACTED

124.    To obtain search warrants, the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant – that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate. That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

**D.    Defendant Koito Manufacturing Co., Ltd. Pleads Guilty to Price-Fixing Automotive Lighting Fixtures and HID Lamp Ballasts**

125.    On January 16, 2014, the DOJ announced that Defendant Koito Manufacturing Co., Ltd. had agreed to pay a $56.6 million fine and plead guilty to a two-count criminal Information charging it with: (1) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive lighting fixtures sold to automobile manufacturers in the United States and elsewhere from at least as early as June 1997 and continuing until on or about July 2011 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; and (2) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive HID lamp ballasts sold to automobile manufacturers in the United States and elsewhere from at least as early as June 1997 and continuing until on or about July 2011 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

126.    According to the criminal Information, Koito Manufacturing Co., Ltd. and its co-conspirators carried out the automotive lighting fixtures conspiracy by:

**REDACTED**

(a)    participating in meeting, conversations, and communications in Japan to  discuss the bids and price quotations to be submitted to certain automobile manufacturers in the United States and elsewhere;

(b)    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain automobile manufacturers;

(c)    agreeing, during those meetings, conversations , and communications, to allocate the supply of automotive lighting fixtures sold to certain automobile manufacturers in the United States and elsewhere on a model-by-model basis;

(d)    agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain automobile manufacturers in Japan;

(e)    submitting bids, price quotations, and price adjustments to certain automobile manufacturers in Japan in accordance with the agreements reached;

(f)    selling automotive lighting fixtures to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)    accepting payment for automotive lighting fixtures sold to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h)    engaging in meetings, conversations , and communications in Japan for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price- fixing scheme; and

**REDACTED**

> (i)    employing measures to keep their conduct secret, including using code names and choosing meeting places and times to avoid detection.

### E.    Defendant Stanley Pleads Guilty to Price-Fixing HID Lamp Ballasts

127.    On November 27, 2013, the DOJ announced that Defendant Stanley Electric Co., Ltd. had agreed to pay a $1.44 million fine and plead guilty to a one-count criminal Information charging it with participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive HID lamp ballasts sold to an automobile manufacturer in the United States and elsewhere from at least as early as July 1998 through at least February 2010 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

128.    According to the Information filed, Defendant Stanley Electric Co., Ltd and its co-conspirators carried out the automotive parts combination and conspiracy by:

> (a)    participating in meeting, conversations, and communications in Japan to  discuss the bids and price quotations to be submitted to certain automobile manufacturers in the United States and elsewhere;

> (b)    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain automobile manufactures;

> (c)    agreeing, during those meetings, conversations , and communications, to allocate the supply of automotive HID lamp ballasts sold to certain automobile manufacturers in the United States and elsewhere on a model-by-model basis;

> (d)    agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain automobile manufacturers in Japan;

32

**REDACTED**

(e)     submitting bids, price quotations, and price adjustments to certain automobile manufacturers in Japan in accordance with the agreements reached;

(f)     selling automotive HID lamp ballasts to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)     accepting payment for automotive HID lamp ballasts sold to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h)     engaging in meetings, conversations, and communications in Japan for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)     employing measures to keep their conduct secret, including using code names and choosing meeting places and times to avoid detection.

**F.     Defendant Mitsuba Corporation Pleads Guilty to Price-Fixing Certain Automotive Parts**

129.    On September 26, 2013, the DOJ announced that Defendant Mitsuba Corporation had agreed to pay a $135 million fine and plead guilty to a two-count criminal Information charging it with: (1) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive parts sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 through at least February 2010 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; and (2) altering, destroying, mutilating, concealing, covering up, falsifying and making entries in documents and tangible objects with the intent to impede, obstruction, and influence the investigation of the conduct charged in Count

33

**REDACTED**

I, and in relation to and contemplation of such investigation, in violation of 19 U.S.C. § 1519. For purposes of Mitsuba's plea agreement, "automotive parts" are defined to include windshield wiper systems and components thereof, windshield washer systems and components thereof, starter motors, power window motors, fan motors, radiator fans, door mirrors, lamps, power seat motors, sunroof, door and tailgate motors, electric power steering motors, electronic throttle motors, horns, automotive electric relays and switches, automotive electric actuators, AC generators, and fuel pumps.

130. According to the Information filed, Defendant Mitsuba Corporation and its co-conspirators carried out the automotive parts combination and conspiracy by:

(a)     participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b)     agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c)     agreeing, during those meetings, conversations, and communications, to allocate the supply of certain automotive parts sold to automobile manufacturers in the United States and elsewhere;

(d)     agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

34

**REDACTED**

(e)     submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)     selling certain automotive parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)     accepting payment for certain automotive parts sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h)     engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)     employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

131.     With respect to the obstruction of justice count, the Mitsuba Information charged as follows:

> In or about February 2010, Executive A, acting on Defendant's behalf, knowingly altered, destroyed, mutilated, concealed, covered up, falsified and made false entries in records, documents and tangible objects with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, to wit, an investigation by the FBI and the United States Department of Justice of possible violations of U.S. antitrust law, in relation to and contemplation of such matter and case, and furthermore did order and command other employees of the Defendant to do so, in violation of 18 U.S.C. § 1519.
>
> After becoming aware of the FBI search of Defendant's co-conspirator's U.S. offices, Executive A informed certain of his subordinates employed at the U.S. subsidiary of Defendant about the FBI search, and instructed such subordinates, as well as other employees of Defendant, to locate, conceal and destroy documents

**REDACTED**

and electronic files that were likely to contain evidence of antitrust crimes in the United States and elsewhere.

Executive A concealed and destroyed documents and electronic files in his possession, custody and control in the Eastern District of Michigan that were likely to contain evidence of antitrust crimes in the United States and elsewhere. Certain of Executive A's subordinates and other employees of Defendant took acts in the Eastern District of Michigan and elsewhere to endeavor to conceal and destroy such documents and electronic files in the possession, custody and control of Defendant, and did conceal and destroy such documents and electronic files.

G.      **Likely Existence of a Cooperating Defendant**

132.    The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the DOJ. In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party that has been accepted into the DOJ's ACPERA program as an "amnesty applicant." One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

133.    In light of the guilty pleas in this case, in related automotive parts antitrust cases and the DOJ's ongoing investigation into the industry, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

H.      **Additional Criminal Pleadings in the Automotive Parts Industry**

134.    On September 29, 2011, the DOJ announced that Furukawa Electric Co. Ltd. had agreed to plead guilty and to pay a $200 million criminal fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of automotive wire harnesses and related products to automobile manufacturers.

REDACTED

135.    In the press release announcing the fine against Furukawa Electric Co. Ltd., Sharis A. Pozen, then the Acting Assistant Attorney General in charge of the DOJ's Antitrust Division, said that "[a]s a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers." Ms. Pozen also stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped." The press release also quoted FBI's Special Agent in Charge Andrew G. Arena, who said that "[w]hen companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," and that "[t]he FBI is committed to aggressively pursuing any company involved in antitrust crimes."

136.    On January 30, 2012, the DOJ announced that Yazaki Corporation had agreed to plead guilty and to pay a $470 million criminal fine and DENSO Corporation had agreed to plead guilty and to pay a $78 million in criminal fine for their respective involvement in multiple price-fixing and bid-rigging conspiracies in the sale of automotive parts to automobile manufacturers in the United States. According to the three-count criminal Information filed against Yazaki, it engaged in three separate conspiracies: (i) to rig bids for and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to certain automobile manufacturers in the United States and elsewhere; (ii) to rig bids for and to fix, stabilize, and maintain the prices of, instrument panel clusters sold to certain automobile manufacturers in the United States and elsewhere; and (iii) to fix, stabilize, and maintain the prices of fuel senders sold to an automobile manufacturer in the United States and elsewhere. According to the two-count felony charge against Defendant DENSO Corporation, it engaged in

**REDACTED**

conspiracies to rig bids for, and to fix, stabilize, and maintain the prices of ECUs and HCPs sold to an automobile manufacturer in the United States and elsewhere.

137.    In the press release announcing the fines against Yazaki Corporation, its executives, and DENSO Corporation, Ms. Pozen vowed to continue the investigation into "pernicious cartel conduct that results in higher prices to American consumers . . . ." In the same press release, Special Agent in Charge Andrew G. Arena said that "[t]his criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring for at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold[.]"

138.    Ms. Pozen said there is no doubt consumers were hurt financially by the automotive wire harness price-fixing conspiracy. She further stated: "By rigging bids on wiring harnesses . . . the three companies inflated what some of their auto manufacturer clients paid, and indirectly, what consumers paid for some cars."

139.    On April 3, 2012, the DOJ announced that G.S. Electech, Inc. had agreed to plead guilty and to pay a $2.75 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, speed sensor wire assemblies used on antilock brake systems sold to an automobile manufacturer in the United States and elsewhere.

140.    On April 23, 2012, the DOJ announced that Fujikura Ltd. had agreed to plead guilty and to pay a $20 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to an automobile manufacturer in the United States and elsewhere.

141.    On June 6, 2012, the DOJ announced that Autoliv Inc. had agreed to plead guilty to a two-count criminal Information and to pay a $14.5 million criminal fine for its involvement

REDACTED

in a combination and conspiracy to suppress competition in the automotive parts industry by (i) agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts sold to a Japanese automobile manufacturer; and (ii) agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts, airbags, and/or steering wheels sold to a Japanese automobile manufacturer.

142.    On July 30, 2012, the DOJ announced that TRW Deutschland Holding GmbH had agreed to plead guilty and to pay a $5.1 million criminal fine for its involvement in a combination and conspiracy, through its employees, including high level employees of its wholly-owned subsidiaries, to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts, airbags and steering wheels sold to two German automobile manufacturers in the United States and elsewhere.

143.    On August 28, 2012, the DOJ announced that Nippon Seiki Co. Ltd. had agreed to plead guilty and to pay a $1 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, instrument panel clusters sold to an automobile manufacturer in in the United States and elsewhere.

144.    On October 30, 2012, the DOJ announced that Tokai Rika Co. Ltd. had agreed to plead guilty and to pay a $17.7 million criminal fine for its involvement in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, HCPs sold to Toyota Motor Corporation and Toyota Motor Engineering & Manufacturing North America, Inc. in the United States and elsewhere. Tokai Rika also agreed to plead guilty to a charge of obstruction of justice related to the investigation of the antitrust violation.

**REDACTED**

145.    On February 15, 2013, Scott Hammond, the Deputy Assistant Attorney General in the DOJ's Antitrust Division, discussed the DOJ's ongoing automotive parts investigation in a Thomson Reuters article. He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered. *I say the biggest with respect to the impact on U.S. businesses and consumers, and the number of companies and executives that are subject to the investigation."* (emphasis added).

146.    On July 16, 2013, the DOJ announced that Diamond Electric Mfg. Co. Ltd. had agreed to plead guilty and to pay a $19 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, ignition coils sold to automobile manufacturers in the United States and elsewhere.

147.    In the press release announcing the fine against Diamond Electric Mfg. Co. Ltd., Robert D. Foley III, Agent in Charge, FBI Detroit Division said "[t]hose who engage in price fixing, bid rigging and other fraudulent schemes harm the automotive industry by driving up costs for vehicle makers and buyers."

148.    On July 18, 2013, Panasonic Corporation had agreed to plead guilty and to pay a $45.8 million criminal fine for its role in a conspiracy to fix prices of various automotive parts including HID lamp ballasts, switches and steering angle sensors installed in automobiles sold in the United States and elsewhere.

149.    On September 26, 2013, eight additional Japanese automotive suppliers, in addition to Mitsuba Corporation, agreed to plead guilty to conspiracy charges and pay more than

REDACTED

$740 million in criminal fines for their roles in rigging the prices of more than 30 different automotive products:

(a)      Hitachi Automotive Systems Ltd. had agreed to plead guilty and to pay a $195 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of automotive parts, including, among others, air flow meters, fuel injection systems, and electronic throttle bodies, sold to automobile manufacturers in the United States and elsewhere;

(b)      Defendant Mitsuba Corporation agreed to plead guilty and to pay a $135 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufactures in the United States and elsewhere.  Mitsuba also agreed to plead guilty to one count of obstruction of justice, because of the company's efforts to destroy evidence ordered by a high-level U.S.-based executive after learning of the U.S. investigation of collusion in the automotive parts industry;

(c)      Mitsubishi Electric Corporation had agreed to plead guilty and to pay a $190 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufacturers in the United States and elsewhere. For purposes of Mitsubishi Electric Corporation's plea agreement, "automotive parts" are defined to include, among other automotive products, fuel injectors, fuel pumps, MAP Sensors, and throttle bodies;

(d)      Mitsubishi Heavy Industries Ltd. had agreed to plead guilty and to pay a $14.5 million criminal fine for its participation in a conspiracy to rig bids for, and

**REDACTED**

to fix, stabilize and maintain the prices of compressors and condensers sold to automobile manufacturers in the United States and elsewhere;

(e)     T.RAD Co. Ltd. had agreed to plead guilty and to pay a $13.75 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of radiators and automatic transmission fluid warmers ("ATF warmers") sold to automobile manufacturers in the United States and elsewhere;

(f)     Valeo Japan Co. Ltd. had agreed to plead guilty and to pay a $13.6 million criminal fine for its participation in a conspiracy to allocate the supply of, rig bids for, and to fix, stabilize and maintain the prices of air conditioning systems sold to automobile manufacturers in the United States and elsewhere;

(g)     JTEKT Corporation had agreed to plead guilty and to pay a $103.27 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings and electric powered steering assemblies sold to automobile manufacturers in the United States and elsewhere;

(h)     NSK Ltd. agreed to had plead guilty and to pay a $68.2 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings sold to an automobile manufacturer in the United States and elsewhere; and

(i)     Yamashita Rubber Co. Ltd. had agreed to plead guilty and to pay an $11 million criminal fine for its participation in a conspiracy to rig bids for, and to fix,

**REDACTED**

raise and maintain the prices of automotive anti-vibration rubber products sold in the United States and elsewhere to automobile manufacturers.

150.    On the same day, September 26, 2013, then United States Attorney General Eric Holder in the Antitrust Division presented the DOJ's most recent findings in the ongoing automotive parts investigation. He stated "[t]hese international price-fixing conspiracies affected more than $5 billion in automotive parts sold to U.S. car manufacturers. In total, more than 25 million cars purchased by American consumers were affected by the illegal conduct." Holder also described how the conspiracies worked: "[c]ompany executives met face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies. To keep their illegal conduct secret, they used code names and met in remote locations. Then they followed up with each other regularly to make sure the collusive agreements were being adhered to." Then Attorney General Holder explained that the automotive parts conspiracies "targeted U.S. manufacturing, U.S. businesses and U.S. consumers. As a result of these conspiracies, Americans paid more for their cars."

151.    The diagram below, which was prepared by the DOJ, illustrates the September 26, 2013 guilty pleas and the corresponding automotive parts to which the various manufacturers have admitted price-fixing.

**REDACTED**



152.    On October 9, 2013, Takata Corporation had announced that it agreed to pay $71.3 million to settle antitrust charges brought by the United States federal prosecutors for its role in a conspiracy to price-fix seatbelts.

153.    On November 26, 2013, the DOJ announced that Toyo Tire & Rubber Co. Ltd. had agreed to plead guilty and to pay a $120 million criminal fine for its role in two separate conspiracies to fix the prices of automotive components involving anti-vibration rubber and driveshaft parts installed in automobiles sold in the United States and elsewhere.

**REDACTED**

154.    On November 27, 2013, the DOJ announced that Defendant Stanley Electric Co. Ltd., as stated above, had agreed to plead guilty and to pay a $1.44 million criminal fine for its participation in a conspiracy to fix prices of automotive HID lamp ballasts installed in automobiles sold in the United States and elsewhere.

155.    On January 16, 2014, the DOJ announced that Defendant Koito Manufacturing Co. Ltd., as stated above, had agreed to plead guilty and to pay a $56.6 million criminal fine for its roles in separate price-fixing conspiracies involving automobile lighting fixtures and automotive HID lamp ballasts installed in cars sold in the United States and elsewhere.

156.    On February 3, 2014, the DOJ announced that Aisan Industry Co. Ltd. had agreed to plead guilty and to pay a $6.86 million criminal fine for its role in a price-fixing conspiracy involving electronic throttle bodies sold to an automobile manufacturer in the United States and elsewhere.

157.    On February 13, 2014, the DOJ announced that Bridgestone Corp. had agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of automotive anti-vibration rubber parts installed in automobiles sold in the United States and elsewhere.

158.    On April 23, 2014, the DOJ announced that Showa Corp. had agreed to plead guilty and to pay a $19.9 million criminal fine for its role in a conspiracy to fix prices and rig bids for pinion-assist type electric powered steering assemblies installed in cars sold in the United States and elsewhere.

159.    On August 19, 2014, the DOJ announced that NGK Sparkplug Co. Ltd. had agreed to plead guilty and to pay a $52.1 million criminal fine for its role in a conspiracy to fix

**REDACTED**

prices and rig bids for spark plugs, standard oxygen sensors, and air fuel ratio sensors installed in automobiles sold in the United States and elsewhere.

160.    On September 29, 2014, the DOJ announced that Toyoda Gosei Co. Ltd. had agreed to plead guilty and to pay a $26 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive hoses sold to Toyota in the United States and by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of, automotive airbags and steering wheels sold to Subaru and Toyota in the United States and elsewhere.

161.    On October 31, 2014, the DOJ announced that Hitachi Metals Ltd. had agreed to plead guilty and to pay a $1.25 million criminal fine for its role in a conspiracy to allocate the sales of, to rig bids for, and to fix, raise, and maintain the prices of automotive brake hose sold to Toyota in the United States and elsewhere.

162.    On November 13, 2014, the DOJ announced that Aisin Seiki Co. Ltd. had agreed to plead guilty and to pay a $35.8 million criminal fine for its role in a conspiracy to allocate customers of variable valve timing devices installed in cars sold to automobile manufacturers in the United States and elsewhere.

163.    On November 24, 2014, the DOJ announced that Continental Automotive Electronics LLC and Continental Automotive Korea Ltd. had agreed to plead guilty and to pay a criminal fine of $4 million for their roles in a conspiracy to rig bids of instrument panel clusters installed in vehicles manufactured and sold in the United States.

164.    On December 1, 2014 the DOJ announced that Kazumi Umahashi, a former executive of Defendant Mitsuba Corporation, had agreed to serve thirteen months in a U.S.

**REDACTED**

prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive parts, including windshield wiper systems, windshield washer systems, starter motors, power window motors, and fan motors, sold to automobile manufacturers in the United States and elsewhere.

165.    On January 27, 2015, the DOJ announced that Sanden Corp. had agreed to plead guilty and to pay a $3.2 million criminal fine for its participation in a combination and conspiracy to allocate the sales of, rig bids for, and fix, raise, and maintain the prices of compressors used in air conditioning systems sold to Nissan North America, Inc. in the United States and elsewhere.

166.    On February 5, 2015, the DOJ announced that a federal grand jury returned a two-count Indictment against two former executives of Defendant Mitsuba Corporation, Hiroyuki Komiya and Hirofumi Nakayama, (1) for their participation in a conspiracy to fix prices and rig bids for various automotive parts including windshield wiper systems and components sold to Honda Motor Company Ltd., Nissan Motor Co. Ltd., Toyota Motor Corp., Chrysler Group, LLC, and Fuji Heavy Industries Ltd. and certain of their subsidiaries in the United States and elsewhere, and (2) for obstruction of justice for ordering the destruction of evidence related to the conspiracy.  According to the Indictment, these former executives knowingly and corruptly persuaded and attempted to persuade employees of Mitsuba Corporation to destroy documents and delete electronic data that may contain evidence of antitrust crimes in the United States and elsewhere.

167.    On March 31, 2015, the DOJ announced that Defendant Robert Bosch GmbH had agreed to plead guilty and to pay a $57.8 million criminal fine for its role in a conspiracy to fix

**REDACTED**

prices and rig bids for spark plugs, oxygen sensors and starter motors sold to automobile and internal combustion engine manufacturers in the United States and elsewhere.

168.     On April 28, 2015, the DOJ announced that Yamada Manufacturing Co., Ltd. had agreed to plead guilty and to pay a $2.5 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of steering columns sold to certain subsidiaries of Honda Motor Co., Ltd., in the United States and elsewhere.

169.     To date, thirty-five companies and fifty-five executives have been charged in the Antitrust Division's ongoing investigation into price-fixing and bid-rigging in the automotive parts industry. Each of the thirty-five companies has either pleaded guilty or agreed to plead guilty and altogether, they have agreed to pay a total of more than $2.5 billion in criminal fines.

170.     "This criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold," said FBI's Special Agent in Charge Andrew G. Arena. "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," Arena also said. "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

I.     **Illustrative Examples**

171.     Illustrative examples of the Defendants' conspiratorial conduct in the market for Automotive Lamps include, but are not limited to, the following:

172.

**REDACTED**

173.

174.

175.

176.

**REDACTED**

177.

178.

179.

REDACTED

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████

## CLASS ACTION ALLEGATIONS

180.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities who, during the Class Period, purchased or leased a new vehicle in the United States not for resale which included one or more Automotive Lamp(s) as a component part, which were manufactured or sold by any Defendant, any current or former subsidiary of a Defendant or any co-conspirator of the Defendants.

181.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following class (the "Damages Class"):

> All persons and entities who, during the Class Period, purchased or leased a new vehicle in the Indirect Purchaser States[1] not for resale which included one or more Automotive Lamp(s) as a component part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant or any co-conspirator of the Defendants.

182.    The Nationwide Class and the Damages Class are referred to herein as the "Classes." Excluded from the Classes are the Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the

---

[1] The Indirect purchaser States are the states listed in the Second and Third Claims for Relief.

**REDACTED**

federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased Automotive Lamps directly or for resale.

183.     While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

184.     Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of the Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)     Whether the Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Automotive Lamps sold in the United States;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(e)     Whether the alleged conspiracy violated state antitrust, unfair competition law, and/or consumer protection laws, as alleged in the Second and Third Claims for Relief;

(f)     Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

52

**REDACTED**

(g)     Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of Automotive Lamps sold in the United States during the Class Period;

(i)     Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

(j)     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Classes;

(k)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(l)     The appropriate class-wide measure of damages for the Damages Class.

185.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by the Defendants' wrongful conduct in that they paid artificially inflated prices for Automotive Lamps purchased indirectly from the Defendants and/or their co-conspirators.

186.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

**REDACTED**

187.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

188.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

189.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

190.    The Defendants' price-fixing conspiracy had the following effects, among others:

(a)    Price competition has been restrained or eliminated with respect to Automotive Lamps;

(b)    The prices of Automotive Lamps have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)    Indirect purchasers of Automotive Lamps have been deprived of free and open competition; and

(d)    Indirect purchasers of Automotive Lamps paid artificially inflated prices.

**REDACTED**

191.    During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for Automotive Lamps. OEMs and automotive dealers passed on inflated prices to Plaintiffs and the members of the Classes. Those overcharges have unjustly enriched Defendants.

192.    The market for Automotive Lamps and the market for vehicles are inextricably linked and intertwined because the market for Automotive Lamps exists to serve the vehicle market. Without the vehicles, the Automotive Lamps have little to no value because they have no independent utility. Indeed, the demand for vehicles creates the demand for Automotive Lamps. As stated in the 2010 Annual Report of Lear Corporation, an automotive parts supplier: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer fleet demand for automotive vehicles."

193.    Automotive Lamps are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle. As a result, Automotive Lamps follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Automotive Lamps can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

194.    Just as Automotive Lamps can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Automotive Lamps affect prices paid by indirect purchasers of new motor vehicles containing Automotive Lamps.

195.    While even a monopolist would increase its prices when the cost of its inputs increased, the economic necessity of passing through cost changes increases with the degree of competition a firm faces. The OEM and dealer markets for new motor vehicles are subject to

REDACTED

vigorous price competition. The OEMs and dealers have thin net margins, and are therefore at the mercy of their component costs, such that increases in the price of components such as Automotive Lamps lead to corresponding increases in prices for new motor vehicles at the OEM and dealer levels. When downstream distribution markets are highly competitive, as they are in the case of new motor vehicles containing Automotive Lamps as components, overcharges are passed through to ultimate consumers, such as the indirect-purchaser Plaintiffs and members of the Classes.

196.    Hence the inflated prices of Automotive Lamps in new motor vehicles resulting from Defendants' bid-rigging and price-fixing conspiracy have been passed on to Plaintiffs and the other members of the Classes by OEMs and dealers.

197.    The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."[2]

198.    As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of indirect purchaser

---

[2] Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 268, 275 (1979).

**REDACTED**

cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers…Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.[3]

199.   The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig or stabilize the price of Automotive Lamps and, as a direct and foreseeable result, the price of new motor vehicles containing Automotive Lamps. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis - called regression analysis - is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of Automotive Lamps on prices for new motor vehicles even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of Automotive Lamps affects changes in the price of new motor vehicles. In such models, the price of Automotive Lamps would be treated as an independent or explanatory variable. The model can isolate how changes in the

---

[3] Order re: Class Certification at 13-14, *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases*, No. J.C.C.P. No. 4106, (Cal. Sup. Ct. Aug. 29, 2000).

REDACTED

price of Automotive Lamps impact the price of new motor vehicles containing Automotive Lamps while controlling for the impact of other price-determining factors.

200.    The precise amount of the overcharge impacting the prices of new motor vehicles containing Automotive Lamps can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed-through the chain of distribution. Thus, the economic harm to Plaintiffs and class members can be quantified.

201.    In addition to the regression analysis discussed above demonstrating impact on consumers, the Department of Justice's Antitrust Division, which has been investigating this cartel for some time, **has concluded that there is "no doubt" that consumers were hurt financially**. Sharis A. Pozen, then Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division said: "By rigging bids . . . [automotive parts manufacturers engaged in a price-fixing conspiracy] inflated what some of their auto manufacturing clients paid, and indirectly, what consumers paid for some cars."  She also explained that "[a]s a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers." Ms. Pozen also stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped." Ms. Pozen went on to say that there was no doubt that United States consumers were hurt financially by the cartel's activity. In a separate press statement, Ms. Pozen vowed to continue the investigation into "pernicious cartel conduct that results in higher prices to American consumers . . . ."

REDACTED

202.    On February 15, 2013, Scott Hammond, the Deputy Assistant Attorney General in the DOJ's Antitrust Division, discussed the DOJ's ongoing automotive parts investigation in a Thomson Reuters article. He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered. *I say the biggest with respect to the* *impact on U.S. businesses and* *consumers, and the number of companies and executives that are subject to the investigation*." (emphasis added).

203.    On September 26, 2013, then United States Attorney General Eric Holder in the Antitrust Division presented the DOJ's then most recent findings in the ongoing automotive parts investigation. He stated "[t]hese international price fixing conspiracies affected more than $5 billion in automobile parts sold to U.S. car manufacturers. In total, more than 25 million cars purchased by American consumers were affected by the illegal conduct." Then Attorney General Holder also described how the conspiracies worked: "[c]ompany executives face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies. To keep their illegal conduct secret, they used code names and met in remote locations. Then they followed up with each other regularly to make sure the collusive agreements were being adhered to." Then Attorney General Holder explained that the automotive parts conspiracies "targeted U.S. manufacturing, U.S. businesses and U.S. consumers. As a result of these conspiracies, Americans paid more for their cars."

204.    On May 25, 2014, news sources reported that Brent Snyder, a deputy assistant attorney general in the Antitrust Division, said with respect to the automotive parts conspiracies,

REDACTED

"[i]t's a very, very safe assumption that U.S. consumers paid more, and sometimes significantly more, for their automobiles as a result of this conspiracy."

205.    By reason of the violations of the antitrust law alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Automotive Lamps than they would have paid in the absence of the Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A.    The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not And Could Not Discover Their Claims

206.    Plaintiffs repeat and re-allege the allegations set forth above.

207.    Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) the public announcements of the government investigations into Automotive Lamps price-fixing began in March 2012.[4]

---

[4] Plaintiffs and members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest), September 26, 2013 for Mitsuba, the date that the DOJ publicly announced it agreed to plead guilty; January 16, 2014 for Koito, the date that the DOJ publicly announced it agreed to plead guilty; and September 24, 2014 for Stanley, the day that Plaintiffs received confidential information regarding Stanley's participation in the combination or conspiracy alleged herein.  No information in the public domain was available to the Plaintiffs and the members of the Classes prior to these dates that revealed sufficient information to suggest that Defendants Mitsuba, Koito and Stanley were involved in the combination or conspiracy alleged herein.  Therefore, the statute of limitations did not begin to run because Plaintiffs and members of the Classes did not and could not discover their claims, or in the alternative, because

*(continued)*

REDACTED

208.    Plaintiffs and the members of the Classes are purchasers who purchased or leased automobiles. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint before the public announcements of the government investigations began in March 2012.

209.    No information in the public domain was available to the Plaintiffs and the members of the Classes prior to the public announcements of the government investigations beginning in March 2012 that revealed sufficient information to suggest that any one of the Defendants was involved in a criminal conspiracy to price-fix and rig bids for Automotive Lamps. Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMs or other direct purchasers, much less the fact that they and their co-conspirators had engaged in the combination and conspiracy alleged herein.

210.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

**B.      Fraudulent Concealment Tolled the Statute of Limitations**

211.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes. Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of

_____

*(continued)*

fraudulent concealment tolled the statute of limitations, until these dates for the respective defendants.

**REDACTED**

reasonable diligence, the existence of the conspiracy alleged herein until the public announcement of the government investigations into Automotive Lamps price-fixing in March 2012.[5]

212.   Before that time, Plaintiffs and members of the Classes were unaware of the Defendants' unlawful conduct, and did not know before then that they were paying supra-competitive prices for Automotive Lamps throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs and the members of the Classes that even hinted to Plaintiffs that they were being injured by the Defendants' unlawful conduct.

213.   The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

214.   Specifically, as then Attorney General Holder explained in connection with the DOJ's globally coordinated investigation into price-fixing in the Automotive parts industry, "[i]n order to keep their illegal conduct secret, [Defendants] used code names and met in remote locations."

215.   As state in the Information filed against Defendant Koito Manufacturing Co., Ltd., the Defendants and their co-conspirators employed "measures to keep their conduct secret, including using code names and choosing meeting places and times to avoid detection."

216.   Defendant Mitsuba Corporation also pleaded guilty to a charge of obstruction of justice in which it explicitly admitted to "altering, destroying, mutilating, concealing, covering

---

[5] *See* footnote 4.

REDACTED

up, falsifying and making false entries in documents and tangible objects with the intent to impede, obstruction, and influence" the DOJ's investigation into the price-fixing of several automotive parts. According to Mitsuba Corporation's plea agreement, in February 2010, three of Mitsuba's senior executives learned that the offices of a co-conspirator had been searched by law enforcement authorities in connection with an investigation of possible antitrust violations, and they directed their subordinates and other employees to "conceal and destroy documents and electronic files" in both the United States and Japan. Mitsuba Corporation's plea agreement confirmed that such evidence was concealed and destroyed.

217.    By its very nature, the Defendants' anticompetitive conspiracy and unlawful combinations were inherently self-concealing.  Automotive Lamps are not exempt from antitrust regulation, and thus, before March 2012, Plaintiffs reasonably considered it to be a competitive industry. Defendants met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the OEMs and other direct purchasers with whom they did business.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Automotive Lamp prices before March 2012.

218.    Plaintiffs and the members of the Classes could not have discovered the alleged conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

219.    Throughout the course of the conspiracy, the Defendants met and communicated in secret in order to conceal their conspiracy from the public and avoid detection thereof. Above

REDACTED

and beyond their acts in furtherance of the conspiracy, such as acts of bid rigging, Defendants engaged in surreptitious activity such as using code names and meeting at private residences or remote locations. The conspirators also coordinated their pricing in a manner to avoid detection by the OEMs. The exact dates and times of these meetings are within the knowledge of the Defendants, including those Defendants and executives of those Defendants who have pleaded guilty to criminal violations of the Sherman Act.

220.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until the public announcements of the government investigations beginning in March 2012.

221.    For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims was tolled and did not begin to run until March 2012.

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

222.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

223.    The Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

224.    The acts done by each of the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

**REDACTED**

225. During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Automotive Lamps, thereby creating anticompetitive effects.

226. The anticompetitive acts were intentionally directed at the United States market for Automotive Lamps and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Automotive Lamps throughout the United States.

227. The conspiratorial acts and combinations have caused unreasonable restraints in the market for Automotive Lamps.

228. As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Automotive Lamps have been harmed by being forced to pay inflated, supra-competitive prices for Automotive Lamps.

229. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

230. Defendants and their co-conspirators' conspiracy had the following effects, among others:

(a) Price competition in the market for Automotive Lamps has been restrained, suppressed, and/or eliminated in the United States;

(b) Prices for Automotive Lamps sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

**REDACTED**

      (c)      Plaintiffs and members of the Nationwide Class who purchased Automotive Lamps indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

231.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Automotive Lamps purchased indirectly from the Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

232.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

233.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

### SECOND CLAIM FOR RELIEF
**Violation of State Antitrust Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

234.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

235.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Automotive Lamps in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

236.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Automotive Lamps and to allocate customers for Automotive Lamps in the United States.

237.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

**REDACTED**

(a)     participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Automotive Lamps at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Automotive Lamps sold in the United States;

(b)     allocating customers and markets for Automotive Lamps in the United States in furtherance of their agreements; and

(c)     participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

238.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate customers with respect to Automotive Lamps.

239.   Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following state antitrust statutes.

240.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4)

**REDACTED**

Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

241.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)      During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Automotive Lamps at supra-competitive levels.

(b)      The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial

**REDACTED**

terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Automotive Lamps.

(c)    For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of Automotive Lamps; and (2) Allocating among themselves the production of Automotive Lamps.

(d)    The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) Price competition in the sale of Automotive Lamps has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Automotive Lamps sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Automotive Lamps directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Automotive Lamps than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their

69

**REDACTED**

cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

242.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive , artificially inflated prices for Automotive Lamps.

(b)    During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

243.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

70

**REDACTED**

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

244.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and

71

**REDACTED**

(4) Plaintiffs and members of the Damages Class paid supra-competitive , artificially inflated prices for Automotive Lamps.

(b)       During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(c)       As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)       By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

245.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)       Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Maine; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)       During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

72

**REDACTED**

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

246.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive , artificially inflated prices for Automotive Lamps.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

**REDACTED**

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

247. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

(a) Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b) During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

(c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

248. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq*.

**REDACTED**

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

249.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open

**REDACTED**

competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive , artificially inflated prices for Automotive Lamps.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

250.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

**REDACTED**

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

251.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive , artificially inflated prices for Automotive Lamps.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et*

**REDACTED**

*seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

252.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

253.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

**REDACTED**

    (a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps when they purchased vehicles containing Automotive Lamps, or purchased products that were otherwise of lower quality than they would have been absent the conspirators illegal acts, or were unable to purchase products that they would have otherwise have purchased absent the illegal conduct.

    (b)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

    (c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    (d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

254.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

**REDACTED**

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq*.

255.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open

**REDACTED**

competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

256.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

81

**REDACTED**

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

257.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et*

REDACTED

*seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

258.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

259.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-3101, *et seq*.

REDACTED

(a)      Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Utah; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)      During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq*.

260.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and

**REDACTED**

(4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

261.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

85

**REDACTED**

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq*.

262.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01*, et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly,

**REDACTED**

Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

263.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for Automotive Lamps than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

264.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

265.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys fees, to the extent permitted by the above state laws.

### THIRD CLAIM FOR RELIEF
Violation of State Consumer Protection Statutes
(on behalf of Plaintiffs and the Damages Class)

266.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the proceeding paragraphs of this Complaint.

267.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

**REDACTED**

268.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.*

(a)    Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Automotive Lamps were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)    The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

(c)    Defendants' unlawful conduct had the following effects: (1) Automotive Lamp price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Automotive Lamp prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(d)    During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

88

**REDACTED**

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

269.   Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)     During the Class Period, Defendants marketed, sold, or distributed Automotive Lamps and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(c)     The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above;

89

**REDACTED**

(2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

(d)    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(e)    Defendants' acts or practices are unfair to consumers of Automotive Lamps (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(f)    Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(g)    Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

(h)    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(i)    The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supra-competitive and artificially-inflated prices for Automotive Lamps (or vehicles containing them). Plaintiffs and the

**REDACTED**

members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(j)    The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

(k)    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

270.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

(a)    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Automotive Lamps were sold, distributed or obtained in the District of Columbia.

(b)    The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Automotive Lamps.  Defendants had the sole power to set that price and Plaintiffs had no

91

**REDACTED**

power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful choice in purchasing Automotive Lamps because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.  Defendants' conduct with regard to sales of Automotive Lamps, including their illegal conspiracy to secretly fix the price of Automotive Lamps at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.  Defendants took grossly unfair advantage of Plaintiffs.  The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Automotive Lamps.

(c)     Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(d)     As a direct and proximate result of the Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and,

**REDACTED**

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

271.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

(a)     Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Florida; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**REDACTED**

272.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

(a)     Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

273.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Mass. G.L. c. 93A, § 2.

(a)     Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

94

**REDACTED**

(b)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which Automotive Lamps were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(c)     Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(d)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class were injured and are threatened with further injury.

(e)     Certain of the Defendants have or will be served with a demand letter in accordance with G.L. c. 93A, § 9, or, upon information and belief, such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.

(f)     By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, § 2. Defendants'

95

**REDACTED**

and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and members of the Damages Class to multiple damages.

274.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

(a)     Plaintiffs and the Damages Class purchased Automotive Lamps for personal, family, or household purposes.

(b)     Defendants engaged in the conduct described herein in connection with the sale of Automotive Lamps in trade or commerce in a market that includes Missouri.

(c)     Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Automotive Lamps were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

(d)     Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Automotive Lamps. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of Automotive Lamps they purchased.

REDACTED

(e)     Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Automotive Lamps by making public statements that were not in accord with the facts.

(f)     Defendants' statements and conduct concerning the price of Automotive Lamps were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing Automotive Lamps at prices established by a free and fair market.

(g)     Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(h)     The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

(i)     As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

(j)     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice

**REDACTED**

or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

275.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-101, *et seq.*

(a)     Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Montana; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq.*, and, accordingly,

**REDACTED**

Plaintiffs and members of the Damages Class seek all relief available under that statute.

276.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

(a)   Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Automotive Lamps was sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)   The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Automotive Lamps as set forth in N.M.S.A., § 57-12-2E.  Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Automotive Lamps.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful choice in purchasing Automotive Lamps because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs' could avoid the overcharges.  Defendants' conduct with regard to sales of Automotive Lamps, including their illegal

**REDACTED**

conspiracy to secretly fix the price of Automotive Lamps at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Automotive Lamps.

(c)     Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(d)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly,

**REDACTED**

Plaintiffs and the members of the Damages Class seek all relief available under that statute.

277.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)   Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Lamps were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)   Defendants and their co-conspirators made public statements about the prices of Alternators and Starters and products containing Automotive Lamps that Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Automotive Lamps and products containing Automotive Lamps; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

(c)   Because of Defendants' unlawful trade practices in the State of New York, New York consumer class members who indirectly purchased Automotive Lamps were misled to believe that they were paying a fair price for Automotive Lamps or the price increases for Automotive Lamps were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy.

**REDACTED**

(d)      Defendants knew that their unlawful trade practices with respect to pricing Automotive Lamps would have an impact on New York consumers and not just the Defendants' direct customers.

(e)      Defendants knew that their unlawful trade practices with respect to pricing Automotive Lamps would have a broad impact, causing consumer class members who indirectly purchased Automotive Lamps to be injured by paying more for Automotive Lamps than they would have paid in the absence of Defendants' unlawful trade acts and practices.

(f)      The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(g)      Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(h)      During the Class Period, Defendants' illegal marketed, sold, or distributed Automotive Lamps in New York and Defendants' illegal conduct substantially affected New York commerce and consumers.

**REDACTED**

          (i)      During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Automotive Lamps in New York.

          (j)      Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

278.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

          (a)      Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Lamps was sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

          (b)      Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases. Defendants' public statements concerning the price of Automotive Lamps created the illusion of competitive pricing controlled by market forces rather than supra-competitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the

**REDACTED**

conspiracy to outsiders, conducting meetings and conversations in secret, confining the plan to a small group of higher-level officials at each company and avoiding the creation of documents which would reveal the antitrust violations.

(c)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)     Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(e)     During the Class Period, Defendants' marketed, sold, or distributed Automotive Lamps in North Carolina and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

(f)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Automotive Lamps in North Carolina.

(g)     Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and

**REDACTED**

are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

279.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

(a)    Plaintiffs and members of the Damages Class purchased Automotive Lamps for personal, family, or household purposes.

(b)    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Lamps were sold, distributed, or obtained in Rhode Island.

(c)    Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Automotive Lamps. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumers, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Automotive Lamps prices were competitive and fair.

(d)    Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Automotive Lamps prices were raised, fixed, maintained, and

**REDACTED**

stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(e)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(f)     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Automotive Lamps, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Automotive Lamps at prices born by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Automotive Lamps they purchased.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

280.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

**REDACTED**

(a)    Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamp price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Automotive Lamp prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

281.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a)    Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Lamps were sold, distributed, or obtained in Vermont.

107

**REDACTED**

(b)     Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning their unlawful activities and artificially inflated prices for Automotive Lamps. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Automotive Lamps prices were competitive and fair.

(c)     Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

(d)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(e)     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Automotive Lamps, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Automotive Lamps at prices born by a free and fair market. Defendants'

**REDACTED**

misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(on behalf of Plaintiffs and the Damages Class)**

282.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

283.    Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra.*

284.   As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Automotive Lamps.

285.   Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Automotive Lamps.

286.   Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

287.   Pursuit of any remedies against the firms from which Plaintiffs and the members of the Damages Class purchased vehicles containing Automotive Lamps subject to Defendants'

**REDACTED**

conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

288.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

252.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

> (a)    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;
>
> (b)    A *per se* violation of Section 1 of the Sherman Act;
>
> (c)    An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and
>
> (d)    Acts of unjust enrichment by Defendants as set forth herein.

253.    Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

110

**REDACTED**

254.    Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

255.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

256.    Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

257.    Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

258.    Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

259.    Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

**REDACTED**

DATED: August 4, 2015

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Devon P. Allard (P71712)
**THE MILLER LAW FIRM, P.C**.
The Miller Law Firm, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
dpa@millerlawpc.com

*Attorneys for Plaintiffs and Interim Liaison Counsel*
*for the Proposed End-Payor Plaintiff Classes*

Hollis Salzman
Bernard Persky
William V. Reiss
**ROBINS KAPLAN LLP**
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
HSalzman@RobinsKaplan.com
BPersky@RobinsKaplan.com
WReiss@RobinsKaplan.com

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

**REDACTED**

Terrell W. Oxford
Omar Ochoa
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone: (214) 754-1900
Facsimile: (214)754-1933
toxford@susmangodfrey.com
oochoa@susmangodfrey.com

Steven N. Williams
Adam J. Zapala
Elizabeth Tran
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
swilliams@cpmlegal.com
azapala@cpmlegal.com
etran@cpmlegal.com

*Attorneys for Plaintiffs and Interim Co-Lead Class Counsel for the Proposed End-Payor Plaintiff Classes*

REDACTED

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure 38(b), of all issues so triable.

DATED: August 4, 2015

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Devon P. Allard (P71712)
**THE MILLER LAW FIRM, P.C.**
The Miller Law Firm, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
dpa@millerlawpc.com

*Attorneys for Plaintiffs and Interim Liaison Counsel*
*for the Proposed End-Payor Plaintiff Classes*

Hollis Salzman
Bernard Persky
William V. Reiss
**ROBINS KAPLAN LLP**
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
HSalzman@RobinsKaplan.com
BPersky@RobinsKaplan.com
WReiss@RobinsKaplan.com

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

1

**REDACTED**

Terrell W. Oxford
Omar Ochoa
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone: (214) 754-1900
Facsimile: (214)754-1933
toxford@susmangodfrey.com
oochoa@susmangodfrey.com

Steven N. Williams
Adam J. Zapala
Elizabeth Tran
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
swilliams@cpmlegal.com
azapala@cpmlegal.com
etran@cpmlegal.com

*Attorneys for Plaintiffs and Interim Co-Lead Class
Counsel for the Proposed End-Payor Plaintiff
Classes*